IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DENNIS KEITH DePRIEST and | ) | Case No. 05-60565 |
| JILL ELLEN DePRIEST, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| THOMAS J. O'NEAL, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-6067 |
| | ) | |
| DENNIS KEITH DePRIEST, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | | |
| UNITED STATES TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-6068 |
| | ) | |
| DENNIS KEITH DePRIEST | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The Chapter 7 Trustee and the United States Trustee each filed Complaints

against Debtor Dennis DePriest[1] based on his failure to disclose his interest in, and income from, a limited liability company and for failing to deliver such interest to the Trustee.  The United States Trustee seeks a revocation of Mr. DePriest's discharge pursuant to 11 U.S.C. § 727(d).  The Trustee seeks a judgment against Mr. DePriest for the amount of money in the company's bank account as of the date of the petition.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (J) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).  The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  For the reasons that follow, judgment will be entered in favor of each of the Plaintiffs.

Dennis and Jill DePriest filed a Chapter 7 bankruptcy petition on March 14, 2005.  At the time the petition was filed, Dennis owned a 100% interest in, and was the sole member of, a Missouri limited liability company known as Precision Equity Partners, LLC ("PEP"), which he formed in April 2004.  Dennis' interest in PEP was not disclosed on the Debtors' schedules, nor was PEP's bank account which had a balance of $33,321.42 as of the petition date.  The Debtors also failed to list $7,500 in monthly income which Dennis was receiving from PEP at the time the petition was

---

[1] Debtor Jill DePriest is not a defendant in these actions.

2

filed. The Debtors received their Chapter 7 discharge on June 30, 2005. The United States Trustee seeks a revocation of Dennis' discharge based on these omissions and the failure to turn over the bank account to the Trustee.[2] The Chapter 7 Trustee seeks a judgment for the amount that was in the account as of the petition date.

Section 727(d) of the Bankruptcy Code provides, in relevant part:

On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if –

> (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; [or]
>
> (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or

---

[2] Although the prayer in the UST's Complaint refers only to § 727(d)(2) expressly, she pled the elements of § 727(d)(1) as well, asserting that "Debtor's [Dennis'] discharge was obtained through the fraud of the Debtor [Dennis], and the United States Trustee and the Trustee did not know of such fraud until after the granting of such discharge," which tracks the language of § 727(d)(1). *Complaint to Revoke Discharge Pursuant to 11 U.S.C. § 727(d)* (Doc. #1), Case No. 08-6068, filed November 5, 2008, at ¶ 10. Because the Complaint fairly included (d)(1) as a basis for revocation of discharge, and the parties proceeded at trial as if that were a basis, I find that the UST's Complaint therefore included a cause of action based on §727(d)(1) as well. *See In re Dominguez*, 51 F.3d 1502, 1508 (9th Cir. 1995) ("In the bankruptcy context, we construe a deficient pleading liberally, if the pleading substantially complies with the requirements of a complaint by giving the debtor 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"); *In re Inland Shoe Mfg. Co.*, 90 B.R. 981 (Bankr. E.D. Mo. 1988) ("Rule 8 of the Federal Rules of Civil Procedure [made applicable in bankruptcy cases by Fed. R. Bankr. P. 7008] requires notice pleading in [a] complaint. Notice pleading means that a complaint need only give the defendant fair notice of what [the] plaintiff's claim is and grounds upon which it rests.") (citation and internal quotation marks omitted).

surrender such property to the trustee.[3]

Revocation of a discharge is an extraordinary remedy,[4] and the party seeking to revoke a discharge must prove each element of § 727 by a preponderance of the evidence.[5]

In order to revoke Dennis' discharge under § 727(d)(1), the UST must show both that the discharge was obtained through Dennis' fraud, and that the UST and Trustee did not know of such fraud until after the granting of the discharge. As to the second element, the Trustee and the UST did not learn anything about the omissions, which are discussed more fully below, until mid-2008, three years into the Debtors' case, based on a tip from an outside source. Dennis does not dispute this, nor does he assert that the Trustee or UST had facts to put them on notice of PEP's existence prior to the discharge. Consequently, I find that the second element of § 727(d)(1) has been met.

The first element is met if Dennis committed a fraud which would have barred his discharge had the fraud been known at the time of the discharge.[6] Section

---

[3] 11 U.S.C. § 727(d)(1) and (2).

[4] *Miller v. Kasden (In re Kasden)*, 209 B.R. 239, 241 (B.A.P. 8th Cir. 1997).

[5] *In re Matos*, 267 Fed. Appx. 884, 887 (11th Cir. 2008) (*citing Grogan v. Garner*, 498 U.S. 279, 289, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); *In re Sendecky*, 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002) ("The burden of proof is on the objecting party to prove each element of a section 727 Complaint by a preponderance of the evidence.").

[6] *In re Massey*, 2007 WL 1173630 at *3 (Bankr. E.D. Ark. April 18, 2007) (not reported).

727(a)(4)(A) provides that the court shall grant a debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[7]  To prove a false oath under this section, the UST must show that Dennis (1) knowingly and fraudulently; (2) in or in connection with the case; (3) made a false oath or account; (4) regarding a material matter.[8]  Statements and representations made by a debtor in his schedules have the force and effect of oaths under § 727(a)(4).[9]

"To merit denial of discharge [under § 727(a)(4)], a debtor's misrepresentation or omission must be material."[10]  "The threshold of materiality is fairly low:  The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[11]  The value of omitted assets is relevant to materiality, but materiality will

---

[7] 11 U.S.C. § 727(a)(4)(A).

[8] *Dains v. Dains (In re Dains),* 384 B.R. 241, 252 (Bankr. W.D. Mo. 2008) (*citing Korte v. United States of America Internal Revenue Serv.(In re Korte),* 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001)).

[9] *Fokkena v. Peterson (In re Peterson)*, 356 B.R. 468, 476 (Bankr. N.D. Iowa 2006) (citing *In re Korte*, 262 B.R. at 474).

[10] *In re Sears*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).

[11] *Id.* (citation and internal quotation marks omitted).

not turn on value."[12]  "An omission of a relatively modest asset will merit denial of discharge, if done with knowledge and fraudulent intent."[13]  Intent under § 727(a)(4) can be established by circumstantial evidence, and statements made with reckless indifference to the truth are regarded as intentionally false.[14]

In order to revoke Dennis' discharge under § 727(d)(2), the UST must first show that Dennis acquired property that was property of the estate, or became entitled to acquire property that would be property of the estate.  Because Dennis was the sole owner of PEP, any value which could be realized from its liquidation became property of his bankruptcy estate.[15]

Similar to § 727(a)(4)'s "knowing and fraudulent" requirement above, a discharge will be revoked under § 727(d)(2) "only if the debtor's failure to deliver property of the estate is done both knowingly and fraudulently."[16]  A debtor's fraudulent intent "may be established by showing that the debtor knowingly made an

---

[12] *Id.*

[13] *Id.*

[14] *In re Korte*, 262 B.R. at 474.

[15] 11 U.S.C. § 541(a)(1) (the commencement of a bankruptcy case creates an estate, which is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case, wherever located and by whomever held); Mo. Rev. Stat. § 347.115 (the interest of a member in a limited liability company is personal property).

[16] *Fokkena v. Klages* (*In re Klages*), 381 B.R. 550, 554 (B.A.P. 8th Cir. 2008).

omission that misleads the trustee or that the debtor engaged in a fraudulent course of conduct."[17] Because fraud is rarely established by admission, "[a] debtor's fraudulent intent may be inferred from all the surrounding circumstances where the debtor's pattern of conduct supports a finding of fraudulent intent."[18] "The focus is on whether the debtor's actions appear so inconsistent with his self-serving statement of intent that the proof leads the court to disbelieve the debtor."[19] "Fraudulent intent may also be established by showing that the debtor acted so recklessly that fraud can be implied."[20]

As can be seen, many of the elements of § 727(a)(4) overlap with the elements of § 727(d)(2), particularly as to the "knowing and fraudulent" element. Consequently, and because the facts supporting both provisions are the same, I discuss them together.

According to Dennis, he formed PEP in April 2004 to lend marketability to his consulting services and to act as a conduit for the income he received for those services. Other than the bank account discussed below, he contends that PEP had no assets. Beginning in November 2004, Dennis began pitching PEP's consulting

---

[17] *In re Kasden*, 209 B.R. at 244; *In re Klages*, 381 B.R. at 554.

[18] *Id.*

[19] *In re Klages*, 381 B.R. at 554 (*citing In re Kasden*, 209 B.R. at 244).

[20] *Id.* (*citing In re Kasden*, 209 B.R. at 244-45).

services to an entity known as The Johnston Companies. At that time, Johnston's owner was intending to expand its business and make it a publicly traded company. Another individual with whom Dennis was associated, Greg Spencer, had already been advising Johnston at that same time. On January 28, 2005, PEP wrote a proposal letter to the president of The Johnston Companies, and enclosed invoices for February, March, and April. The evidence was that, although the February invoice was enclosed with the proposal, Johnston did not accept the proposal until about March 3, 2005.[21] At that point, PEP began to provide formal consulting services to assist and advise Johnston in its transition in going public. There was no formal contract between PEP and Johnston, nor was there a specified duration for the consulting services. Rather, Johnston paid PEP $15,000 per month, in advance, for its services, which Dennis and Spencer agreed to split evenly. Johnston could terminate the relationship by simply not paying for the next month's services. PEP provided consulting services to Johnston through August 2005.

Meanwhile, in early January 2005, Dennis opened a bank account in PEP's

---

[21] The January 28 proposal letter was stamped with a "received" stamp dated March 3, 2005. Johnston's accounting controller testified at trial that that meant Johnston's president had approved the proposal that day, thus authorizing the payment for March services. However, Johnston's next "check run date" was not until March 11. As a result, Johnston's controller authorized the accounting department to issue the a $30,000 check, representing $15,000 for March services, and $15,000 prepayment for April services. Based on this evidence and testimony, I find that PEP did not begin formal consulting services for Johnston, for compensation, until March 3.

name at Commerce Bank. He was the only signatory on the account at all times relevant here. He made two deposits into the account in January, totaling $6,300, which came from either his personal account or a separate consulting agreement with Barrett Trailers, discussed below.[22] He made two additional deposits in February 2005, totaling $3,224.89, also from personal funds or Barrett Trailers. Also in February 2005, he used the account's debit card to purchase a computer which, he testified, he used as part of PEP's business. Six checks, totaling $5,359.71, were paid from the account in February, although the evidence was not clear to whom each of those checks was written.

On March 14, 2005, the day the Debtors filed their bankruptcy petition, Dennis deposited $30,000 into the PEP account, resulting in a balance of $33,321.42 on that day.[23] The $30,000 came from Johnston in payment for PEP's services for March and April 2005. Dennis continued to use the debit card and write checks from the PEP account from that point forward, mostly to pay personal and household expenses.

Dennis stated at the trial that it did not occur to him to disclose his interest in PEP, or its bank account, because PEP was not yet "operational" when he completed the schedules on February 25, 2005, and because he believed PEP had no value. He

---

[22] Dennis made a $100 deposit on January 4, and a $6,200 deposit on January 26, 2005.

[23] Although the deposit slip for this deposit shows a date of March 11, the deposit did not post to the account until March 14, 2005, the day the petition was filed.

says, and the evidence showed, that he used the PEP account largely for personal expenses, and he did not file separate income tax returns for it, instead claiming PEP's revenues as income on his personal tax returns. As a result, he says he did not consider PEP to be an "asset" such that he was required to list it on his schedules.

Dennis is a sophisticated business person. He has an extensive business background and provides consulting services to companies on complicated business matters, for which his clients pay him a significant amount of money. Given his background, his assertion that he neglected to list his interest in PEP because he did not consider it to be an asset is simply not credible. And, as the UST pointed out at the trial, Dennis did think to list his ownership interest in another business with which he was no longer actively involved, and he listed two life insurance policies with zero value, as he was required to do: debtors have an absolute duty to report assets, even if they believe they were worthless.[24]

Moreover, despite Dennis' stated belief that PEP was not operational until he began formal consulting services on March 3, PEP was indeed active when the schedules were completed on February 25, in the sense that Dennis was pitching its services and negotiating agreements on its behalf. In other words, PEP was not simply a shell entity that Dennis created but never used and forgot about. And, even

---

[24] *In re Kasden*, 209 B.R. at 243-33 (citation omitted).

if it were believable that Dennis did not consider PEP to be operational as of February 25 because he had not yet closed the deal with Johnston, he was using PEP's bank account at the time.  Specifically, he used the account's debit card to buy a $2,500 computer on February 21, 2005, and wrote at least six checks totaling more than $5,000 against the account prior to February 25.  Dennis testified that he treated the PEP account as if it were a sort of personal account, sometimes paying personal bills out of it rather than writing a check to his personal account and paying the personal bills from that.  He further testified that he did not disclose the PEP account (as opposed to his ownership interest in the PEP LLC itself) because he viewed the account as a conduit for his consulting income – money for his services coming in, and then going out to pay bills.  But that is precisely what a checking account does – provide a means for money flowing in and out to pay bills.  Thus, regardless of whether Dennis was using the PEP account for business or personal use, or both, his explanations for not making any reference to his interest in either PEP, or its bank account, lack credibility.

Of perhaps even greater importance, however, Dennis failed to disclose his income from PEP's consulting arrangement with Johnston on Schedule I.  The schedules he filed list $8,000 in monthly income which he was receiving from consulting services for Barrett Trailers, a Chapter 11 debtor-in-possession in

Oklahoma,[25] and monthly expenses of $8,512. Assuming that Dennis was not certain, at the time he completed his schedules on February 25, that Johnston would accept PEP's proposal for his services, he was certainly hopeful that it would in the near future, as evidenced by the invoices attached to the proposal letter and his purchase of the computer for use in connection with PEP. Yet the Debtors made no response to the instruction to "[d]escribe any increase or decrease of more than 10% in any of the above categories [concerning income] anticipated to occur within the year following the filing of this document." More importantly, by the time the schedules were filed on March 14, Johnston had accepted the proposal and had already paid PEP for two months of services. As a result, at the time the petition was filed, Dennis' income was $15,500 per month, nearly double the $8,000 income which he had disclosed on his schedules.

The failure to disclose the additional income is significant because, even before the enactment of BAPCPA,[26] a Chapter 7 debtor's ability to fund a plan was the primary factor to be considered in determining whether granting relief would be a

---

[25] Dennis had been providing those services to Barrett Trailers pursuant to an Order authorizing his employment in Barrett Trailers' bankruptcy case from November 2004, and continued to do so through November 2005. Barrett Trailers paid Dennis $2,000 per week, plus expenses, for his services.

[26] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, S. 256, Pub.L. 109-8, 119 Stat. 23 (2005), applicable to cases filed after October 17, 2005.

substantial abuse of the provisions of Chapter 7, warranting dismissal pursuant to § 707(b).[27] Had the additional $7,500 monthly income been disclosed, the Debtors could well have been the subject of a § 707(b) motion by either the UST or the Court,[28] based on the contention that the Debtors' income demonstrated an ability to fund a Chapter 11 plan and pay a significant amount to unsecured creditors.[29] Instead, the schedules as filed indicated that the Debtors did not have sufficient income to pay their ongoing monthly expenses, much less any left over to pay to such creditors.

Finally, even if the initial nondisclosures on the schedules could be overlooked because the Debtors signed them two or three weeks prior to the filing of the case, or Dennis' claimed perception about whether PEP was operational and/or an asset, he never amended the schedules or otherwise disclosed the existence of PEP, the bank account, or, most significantly, the income from his consulting agreement with

---

[27] *Stuart v. Koch (In re Koch)*, 109 F.3d 1285, 1286 (8th Cir. 1997) ("[A] Chapter 7 debtor's ability to fund a Chapter 13 plan 'is the primary factor to be considered in determining whether granting relief would be a substantial abuse.") (*cited in In re Keepper*, 329 B.R. 693, 696 (Bankr. W.D. Mo. 2005). Because of the amount of their unsecured debts, the Debtors here would not have qualified for Chapter 13 pursuant to § 109(e). However, although BAPCPA expressly codified Chapter 11 eligibility for individuals, individuals were eligible to be debtors under Chapter 11 when this case was filed. *See Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (holding that an individual debtor not engaged in business is eligible for Chapter 11).

[28] 11 U.S.C. § 707(b)(1), as applicable to cases filed prior to October 17, 2005.

[29] As stated above, the Debtors listed $8,512 in expenses on their schedules. Given that PEP had few, if any, expenses of its own to offset the revenue from Johnston, the additional $7,500 in income would have resulted in net disposable income of approximately $7,000 per month.

Johnston. Dennis contends that he was required to attend several court hearings and other examinations by the Trustee, suggesting that he has been harassed and should have been entitled to receive his discharge and move on with his life. I recognize that many of the Debtors' meetings with the Trustee focused on matters unrelated to PEP or Johnston, but the fact is that the schedules contained significant omissions, particularly as to the income, which were never voluntarily disclosed to the Trustee.[30] Dennis had a continuing obligation to correct the misstatements and omissions in the schedules. As he points out, he also had several opportunities to advise the Trustee directly of the existence of PEP and the income he was receiving from it at the time the case was filed. His failure to do so can hardly be said to have been inadvertent.

Based on the foregoing, I find that Dennis' failure to disclose these matters relating to PEP on his schedules was a false oath or account regarding a material matter in or in connection with his bankruptcy case, and that the omissions were made knowingly and fraudulently, as those terms are defined for purposes of § 727. At a minimum, the failure to disclose these matters in the schedules, and throughout the case, was "reckless enough that fraud can be implied."[31] As a result, cause existed to deny Dennis' discharge under § 727(a)(4), had the Trustee or UST known about the

---

[30] As mentioned above, the Trustee found out about PEP three years into the Debtors' bankruptcy case, based on a tip from an outside source.

[31] *In re Klages*, 381 B.R. at 554 (*citing In re Kasden*, 209 B.R. at 244-45).

omissions before the discharge was entered. Consequently, cause exists to revoke Dennis' discharge pursuant to § 727(d)(1).

In addition, I find that the omissions and subsequent failure to turn over the interest in PEP were knowing, and that the Trustee and Court were misled by them, warranting revocation of discharge pursuant to § 727(d)(2).[32]

The Trustee seeks a judgment for the amount of money that was in PEP's account as of the petition date. The Trustee is correct that, because Dennis was the sole owner of PEP, any value which could be realized from its liquidation became property of the bankruptcy estate. On the other hand, Dennis is correct that the Trustee would be required to pay PEP's obligations before PEP's funds would be available to the Debtors' estate. As stated above, the account had a balance of $33,321.42 when the case was filed, $30,000 of which came from Johnston for March and April consulting services. Dennis' uncontroverted testimony was that the arrangement was for prepayment for services and that, if PEP did not perform the services paid for, PEP would be required to refund the money to Johnston. So, as of March 14, PEP had actually earned only eleven days worth of services, which would amount to approximately $5,000. Half of that belonged to Spencer. Dennis identified no other creditors of PEP who were entitled to payment at the time of the bankruptcy

---

[32] *In re Kasden*, 209 B.R. at 244; *In re Klages*, 381 B.R. at 554.

15

filing. Consequently, PEP possessed Dennis' share of the fees already earned from Johnston, or $2,500, plus the $3,321.42 in the account which came from sources other than Johnston, for a total of $5,821.42. That amount became an asset of the Debtors' bankruptcy estate when they filed the case on March 14. As a result, the Trustee is entitled to a judgment in that amount.

   Orders in accordance with this Memorandum Opinion will be entered this same date.

                /s/ Arthur B. Federman
                Bankruptcy Judge

Date: 3/26/2009